## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| AMERICAN FAMILY MUTUAL INSURANCE COMPANY, as subrogee of Robert and Mandy Harris, et al.,<br><br>          **Plaintiffs,**<br><br>v.<br><br>TECHTRONIC INDUSTRIES NORTH AMERICA, INC., et al.,<br><br>          **Defendants.** | **CIVIL ACTION**<br><br>**No. 12-2609-KHV** |

## MEMORANDUM AND ORDER

American Family Mutual Insurance Company, Robert Harris and Mandy Harris bring suit against Techtronic Industries North America, Inc. ("TI North America"), OWT Industries, Inc. and Techtronic Industries Factory Outlets, Inc. ("TI Factory Outlets") asserting that a defective gasoline-powered pressure washer caused a fire on August 22, 2010. Specifically, under the Kansas Product Liability Act ("KPLA"), K.S.A. § 60–3301 et seq., plaintiffs assert claims for inadequate warning, design defect and manufacturing defect. This matter comes before the Court on Plaintiffs' Motion For Summary Judgment On Defendants' Fourth Affirmative Defense And Memorandum In Support Thereof (Doc. #60) filed October 25, 2013;[1] defendants' Motion For Summary Judgment (Doc. #62)

---

[1]     Plaintiffs seek summary judgment on defendants' fourth affirmative defense, i.e. that some or all claims should be barred and/or dismissed because American Family intentionally failed to preserve the pressure washer at issue in this case. Defendants state that they raise this defense in response to plaintiffs' claims that the pressure washer was defectively manufactured and designed. See Memorandum In Opposition To Plaintiffs' Motion For Summary Judgment On Defendants' Fourth Affirmative Defense Regarding Plaintiffs' Spoilation Of Evidence (Doc. #76) filed November 22, 2013 at 2. As discussed below, defendants are entitled to summary judgment on the merits of these claims. Accordingly, the Court overrules as moot plaintiffs' motion to preclude defendants' fourth affirmative defense.

filed October 25, 2013; <u>Defendants' Motion To Strike Or Disregard The Declaration Of Plaintiff Robert Harris And Supporting Memorandum</u> (Doc. #86) filed December 13, 2013;[2] and <u>Defendants' Motion To Strike Or Disregard The Declaration Of Jennifer Chick, CPA, And Supporting Memorandum</u> (Doc. #83) filed December 13, 2013.[3] For reasons stated below, the Court sustains defendants' motion for summary judgment in part.

## I.    Legal Standards

Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories and admissions on file, together with affidavits and other materials, if any, show no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. <u>See</u> Fed. R. Civ. P. 56(a), (c); <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 247 (1986); <u>Kaufman v. Higgs</u>, 697 F.3d 1297, 1300 (10th Cir. 2012). A factual dispute is "material" only if it "might affect the outcome of the suit under the governing law." <u>Liberty Lobby</u>, 477 U.S. at 248. A "genuine" factual dispute requires more than a mere scintilla of evidence. <u>Id.</u> at 252.

The moving party bears the initial burden of showing the absence of any genuine issue of material fact. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986); <u>Hicks v. City of Watonga, Okla.</u>, 942 F.2d 737, 743 (10th Cir. 1991). Once the moving party meets its burden, the burden shifts to the nonmoving party to demonstrate that genuine issues remain for trial as to those dispositive

---

[2]    Defendants urge the Court to strike the Declaration of Robert Harris, Exhibit 18 to <u>Plaintiffs' Memorandum In Opposition To Defendants' Motion For Summary Judgment</u> ("<u>Plaintiffs' Memorandum</u>") (Doc. #77) filed November 22, 2013. The Court considers the motion only with respect to facts which are material to its ruling on the motions for summary judgment.

[3]    Defendants urge the Court to strike the Declaration of Jennifer R. Chick, CPA, Exhibit 10 to <u>Plaintiffs' Memorandum</u> (Doc. #77). In ruling on defendants' motion for summary judgment, the Court does not rely on the declaration. Accordingly, the Court overrules as moot defendants' motion to strike the Chick Declaration.

matters for which he carries the burden of proof.  See <u>Applied Genetics Int'l, Inc. v. First Affiliated</u> <u>Sec., Inc.</u>, 912 F.2d 1238, 1241 (10th Cir. 1990); <u>see also</u> <u>Matsushita Elec. Indus. Co. v. Zenith</u> <u>Radio Corp.</u>, 475 U.S. 574, 586-87 (1986); <u>Bacchus Indus., Inc. v. Arvin Indus., Inc.</u>, 939 F.2d 887, 891 (10th Cir. 1991).  The nonmoving party may not rest on its pleadings but must set forth specific facts.  <u>Applied Genetics</u>, 912 F.2d at 1241.

The Court must view the record in a light most favorable to the party opposing the motion for summary judgment.  See <u>Deepwater Invs., Ltd. v. Jackson Hole Ski Corp.</u>, 938 F.2d 1105, 1110 (10th Cir. 1991).  Summary judgment may be granted if the nonmoving party's evidence is merely colorable or is not significantly probative.  <u>Liberty Lobby</u>, 477 U.S. at 250-51.  In a response to a motion for summary judgment, a party cannot rely on ignorance of facts, on speculation or on suspicion, and may not escape summary judgment in the mere hope that something will turn up at trial.  <u>Conaway v. Smith</u>, 853 F.2d 789, 794 (10th Cir. 1988).  Essentially, the inquiry is "whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law."  <u>Liberty Lobby</u>, 477 U.S. at 251-52.

## II.    Facts

The following facts are either undisputed or construed in the light most favorable to plaintiffs.[4]

---

[4]    The Court includes only those facts which are material to its rulings herein and disregards any facts which record citations do not properly support. Pursuant to D. Kan. Rule 56.1, the Court considers only those facts which the parties include in their statement of facts, in numbered fact paragraphs with proper record citation and support.  <u>See</u> <u>Cook v. Olathe Med. Ctr.,</u> <u>Inc.</u>, No. 10-2133-KHV, 2011 WL 2690060, at *2 n.1 (July 11, 2011); <u>Vasquez v. Ybarra</u>, 150 F. Supp.2d 1157, 1160 (D. Kan. 2001). For purposes of summary judgment, the Court deems all such facts admitted unless specifically controverted by the opposing party. D. Kan. Rule 56.1. The Court does not consider facts which the parties discuss only in the argument section of their briefs
(continued...)

### A.    Fire On August 22, 2012

On August 22, 2010, Robert Harris used a reconditioned Power Stroke Pressure Washer Model No. PS80903B ("Power Stroke") for at least five continuous hours to clean exterior portions of his home in Overland Park, Kansas.  The pressure washer operated as Harris expected, and did not cause concern that he was in danger or that it might cause a fire.  Harris did not smell gas fumes and did not see gas leaking or seeping from the machine.

 After cleaning his house, Harris left the Power Stroke on his deck for "five to fifteen" minutes, i.e. the time it takes to get and drink a beer.  Harris then carried the pressure washer from his deck down at least seven stairs to the garage, a distance of less than 20 feet, with the muffler guard away from his body.  The Power Stroke included an on-product warning label which stated "Hot Surface," with an arrow pointing in the general direction of the muffler guard.  The muffler guard is made of metal and is stamped with the word "HOT."  Harris does not remember any gas spilling or any remarkable smell of gas while he carried the product to the garage.

Before putting the Power Stroke away, Harris observed that a clamp was missing from the gas line.  Harris does not recall if he noticed the missing clamp while he was operating the pressure washer but he definitely remembers noticing it in the late afternoon.  Harris Depo. at 77-7-78:17; 111:14-112:7.  The gas line was indented, so Harris believes that the clamp was present at some

---

[4](...continued)
and not in the statement of facts.  Id.; see Cook, 2011 WL 2690060, at *2 n.1; Jones v. Unified Gov't of Wyandotte Cnty./Kansas City, Kan., 552 F. Supp.2d 1258, 1261 n.1 (D. Kan. 2008).  Also, the Court does not consider arguments raised for the first time in a reply brief.  See Rubio v. Turner Unified Sch. Dist. No. 202, 523 F. Supp.2d 1242, 1252 (D. Kan. 2007).

point in time.[5]  Harris does not know when the clamp came off or what caused it to come off.

After Harris put the Power Stroke away, a fire caused significant damage to his home and personal property.[6]  The parties agree that the Power Stroke was the source of ignition.

The Overland Park Fire Department investigated the fire.  Based on evidence at the scene and multiple interviews with Harris, Investigator Mark Sweeney concluded as follows: The fire appeared to be accidental, in that a hot manifold was located too close to combustible mower bags and a flammable liquid container.  The flammable liquid container was within inches of the hot manifold.  The area of origin was just inside the lower level garage door, behind the riding lawnmower.

Plaintiffs' cause and origin expert, Dan Anderson, agrees with Sweeney's findings.  Anderson concluded that the fire was the result of the hot power washer exhaust manifold being place against combustible materials located near floor level between the right rear tire of the riding mower and the overhead door in the east rear garage.  Anderson testified that the garage contained four containers of gasoline: (1) the gas tank of the Power Stroke, which was sitting behind a riding lawnmower; (2) a partially-full gas can near the Power Stroke; (3) the lawnmower gas tank; and (4) the gas tank of a nearby all-terrain vehicle ("ATV").  None of the gas tanks, or their contents, survived the fire.  Anderson Depo., Defendants' Exhibit K at 145:16-147:21.  Anderson cannot determine the order in which the gasoline components burned.  Id. at 146:22-147:18.

---

[5]     At the time he purchased the machine, Harris did not notice whether a clamp was missing from the gas line.

[6]     The record does not disclose the amount of time which elapsed between when Harris put the Power Stroke away and when the fire occurred.

**B.     Power Stroke Operator Manual**

Harris purchased the reconditioned Power Stroke at the Direct Tools Factory Outlet Store

in Osage Beach, Missouri.[7]   Harris purchased a floor model which had been assembled by Factory

Outlet personnel.[8]   When Factory Outlet personnel assemble pressure washers to use as floor

models, they do not inspect them.  Also, Factory Outlet personnel do not inspect floor models before

selling them.

When Harris purchased the Power Stroke, he received its operator manual.  Harris skimmed

the manual for a couple of minutes to see if it contained anything "neat."[9]  Harris Depo. at 37:20-25;

---

[7]       Although the record is not clear, it appears that the Factory Outlet is part of TI
Factory Outlets.

[8]       Defendants attempt to controvert this fact with deposition testimony by Harris.  <u>See</u>
<u>Reply Memorandum In Support Of Motion For Summary Judgment</u> ("<u>Defendants' Reply</u>")
(Doc. #82) filed December 13, 2013.  In his deposition, Harris testified that he did not recall whether
the Power Stroke was boxed up or assembled, or whether it was a floor model.  <u>See</u> Robert Harris
Depo. at 53:15-23, Exhibit B to <u>Defendants' Reply</u> (Doc. #82).  In a transcribed statement taken the
day after fire, Harris stated that he had purchased a floor model.  <u>See</u> Transcribed Statement,
Exhibit 14 to <u>Plaintiffs' Memorandum</u> (Doc. #77) at 9.  In ruling on defendants' motion for
summary judgment, the Court construes this fact in the light most favorable to plaintiffs.  In other
words, the Court accepts plaintiffs' version, <u>i.e.</u> that Harris purchased a floor model which was pre-
assembled by Factory Outlet employees.  This fact appears to be relevant to plaintiffs' theory that
the pressure washer was missing a fuel-line clamp at the time of purchase.  As discussed below,
plaintiffs cannot prevail on this theory because they have not shown that a missing fuel-line clamp
caused the fire and contributed to an unreasonably dangerous condition.

[9]       Harris testified that generally, if he's going to read the manual and it has a warning,
he would probably heed the warning.  Id. at 36:15-17.

Regarding whether he read the manual, Harris testified as follows:

Did I read the manual on it? I skimmed through it to see if there's anything neat in
there.  Did I stop?  I saw the warning symbol.  You know, it's on the very first page,
it's a little triangle with a burn or something on it, and I know that it means, "Don't
touch it because it's hot."  Did I read every passage in there that had to do with that?
No, because I'd already known.  I was looking to see if it had an automatic soap

(continued...)

114:20-115:6. Harris noticed that the Power Stroke had an automatic soap feature, which he thought was neat. Id. at 115:7-23. He glanced through the manual to find out how it worked, but the information did not stick out to him and he never figured it out. Id. Harris saw the triangle-shaped warning symbol on the first page which indicated that the product gets hot and can burn you. Id. at 37:25-38:4. Harris did not fully read the manual and does not recall reading any specific part of the manual. Harris assumed that the operator's manual contained safety information.

The Power Stroke operator manual is 16 pages long. See Power Stroke Operator Manual, Exhibit H to Memorandum In Support Of Motion For Summary Judgment ("Defendants' Memorandum") (Doc. #63) filed October 25, 2013. The front cover states as follows: "Warning. To reduce risk of injury the user must read and understand the operator's manual before using this product." Page five contains an explanation of symbols in the book. One symbol shows a person reading a book. The name of the symbol is "Read the Operator's Manual." The explanation of the symbol states as follows: "To reduce the risk of injury, user must read and understand operator's manual before using this product." Regarding unpacking and assembly, the operator manual states as follows: "Operation of a product that may have been improperly preassembled could result in serious personal injury."

The manual provides "IMPORTANT SAFETY INSTRUCTIONS" which advise, in part, as follows:

    •    **Stay alert and exercise control.**  Watch what you are doing and use common sense.  Do not operate tool when you are tired.  Do not rush.

---

[9](...continued)
feeder on it or something similar to that.  Did I read the verbatim the owner's manual?  No.

Harris Depo. at 37:23-38:10.

＊ ＊ ＊

- **Do not operate around** dry brush, twigs, cloth rags or other flammable materials.

<u>Id.</u> at 3 (emphasis in original).

The manual also provides "SPECIFIC SAFETY RULES" which advise, in part, as follows:

- **Keep cooling air intake** (recoil starter area) and muffler side of engine at least 3 feet away from buildings, obstructions, or other combustible objects.
- **Keep the engine away from flammables and other hazardous materials.**
- **Keep away from hot parts.** The muffler and other engine parts become very hot; use caution.
  ＊ ＊ ＊
- **Before storing, allow engine to cool.**
  ＊ ＊ ＊
- **Make sure minimum clearance of 3 feet** is maintained from combustible materials.

<u>Id.</u> at 4 (emphasis in original).

In the maintenance section, under the heading "Storing the Pressure Washer," the manual states as follows:

Store the pressure washer with the gas tank empty by either draining the tank or running the pressure washer until the gas runs out. Allow 30 minutes of "cool down" time before storing the machine. Store in a dry, covered area where the weather can't damage it.

<u>Id.</u> at 13.

The warnings on the fourth page of the manual were modeled after sections 114 and 115 in the American National Standard Institute ("ANSI")/Underwriters Laboratories Standard for Safety of High Pressure Cleaning Machines, UL 1776, revised through August 15, 2005 ("UL 1776"). UL 1776 is not a binding or mandatory standard or regulation, but OWT Industries uses portions of the standard as a guide for testing procedures for its pressure washers. While some manufacturers use the standard as a testing guide, no pressure washer manufacturer currently lists its pressure

washer with UL 1776.

The Power Stroke operator manual does not specifically warn that the Power Stroke gets hot enough to start a fire. Plaintiffs' warnings expert, Michael Wogalter, has not identified any statute, governmental regulations, mandatory industry standard or voluntary industry standard which the Power Stroke warnings, manuals or on-product labels violated.

### C. Harris Purchased Exemplary Power Strokes From Factory Outlet After Fire

One week after the fire, Harris returned to the Factory Outlet to purchase exemplar pressure washers like the Power Stroke that caused the fire. Declaration of Robert Harris ¶13, Exhibit 18 to <u>Plaintiffs' Memorandum</u> (Doc. #77).[10] Harris purchased two exemplar pressure washers, both of which were missing fuel-line clamps at the fuel pump. <u>Id.</u> Harris saw one more pressure washer which was also missing the fuel-line clamp. <u>Id.</u> The Factory Outlet had no other pressure washers that day. <u>Id.</u> Harris pointed out to a Factory Outlet salesperson that the three pressure washers on the floor were missing fuel-line clamps. <u>Id.</u> ¶ 14. The salesperson responded as follows: "They're all like that. That's just the way they come." <u>Id.</u>

### D. Harris's Prior Experience

Before August 22, 2010, Harris had used the reconditioned Power Stroke only one time.

---

[10]   Defendants seek to strike paragraphs 13 and 14 of the Declaration of Robert Harris on grounds that they attempt to create a sham fact issue, <u>i.e.</u> a "new found memory" which was not disclosed in discovery. <u>See</u> <u>Motion To Strike Harris Declaration</u> (Doc. #86) at 8-10. In their reply brief, however, defendants concede that plaintiffs disclosed the information in supplemental disclosures. <u>See</u> <u>Defendants' Reply Memorandum In Support Of Their Motion To Strike Or Disregard The Declaration Of Plaintiff Robert Harris</u> (Doc. #96) filed January 22, 2014 at 4. The Court agrees with plaintiffs that defendants' interrogatories did not clearly require disclosure of said information. <u>See</u> <u>Opposition Of The Harris Plaintiffs To Defendants' Motion To Strike The Declaration Of Robert Harris</u> (Doc. #91) filed January 7, 2014 at 4. Defendants do not cite any inconsistent deposition testimony by Harris. On this record, the Court will not strike paragraphs 13 and 14 of his declaration.

Harris had owned other pressure washers, though, and had used them often. All of his pressure washers appeared to operate the same way. Harris had owned other equipment with small gas engines and performed his own maintenance on those machines.

In 1977, Harris received vocational training to be a car mechanic, including training on gasoline engines in cars. Based on his training and experiences, Harris knew the following: (1) gasoline engines burn gasoline; (2) engines and their components become hot during operation; (3) he himself had suffered burns from touching a hot engine; (4) exhaust gases from engines are hot; (5) metal parts that vent hot exhaust gases get hot; (6) engines stay hot for a period of time after the engine stops; (7) exhaust parts of engines stay hot for a period of time after the engine stops; (8) plastic can burn; (9) paper can burn; (10) fabric can burn; (11) dried remnants of grass clippings and leaves can burn; and (12) gasoline burns.[11]

### E.    Defendants' Involvement With Power Stroke

Defendants have not conducted any testing or gathered any data concerning the level of education, experience with power tools, and/or trade or occupation of people who use or buy the Power Stroke. Users and consumers of the Power Stroke are not required to have any particular knowledge, experience or training. Defendants have not conducted any testing or gathered any data concerning how consumers, owners or users actually use or store the Power Stroke.

Defendants tested the temperature of the Power Stroke controls, trigger and parts that a user

_____

[11]    Plaintiffs assert that Harris did not know that after use, the Power Stroke could be hot enough to start a fire. See Plaintiffs' Memorandum (Doc. #77) at 23, ¶ 30. The evidence which plaintiffs cite, however, does not support the assertion. See Plaintiff Robert Harris' Answers And Objections To The First Interrogatories Of Defendant OWT Industries, Inc., Exhibit 9 to Plaintiffs' Memorandum (Doc. #77) ("I do not believe that the manufacturer gave me adequate warnings of danger of fire when storing the power washer after use."). The Court therefore does not consider it.

would come into contact with while lifting and carrying the product. Defendants do not know how hot the surfaces of the Power Stroke are after use, or how long the surfaces remain hot after use. Before re-selling used power washers, during the reconditioning process, defendants did not do any temperature testing.

### 1.    OWT Industries

OWT Industries designed, manufactured and reconditioned the Power Stroke. The specifications for the Power Stroke include a "clamp" or "clip" that secures the fuel line to the engine. During the "refurbishment" or "reconditioning" process, OWT employees detach the fuel line from the engine. After testing, employees reattach the fuel line.

Arthur Grubbs, III, an OWT employee at the manufacturing plant in Pickens, South Carolina, reconditioned the Power Stroke at issue in this case. Before the unit was packaged and shipped, Grubbs tested the pressure washer and determined that the engine was good, the pump was good and the machine had no apparent defect. As part of his training, Arthur Grubbs made sure that clips were on the fuel lines. If a clip was missing, he would put one on the fuel line after he completed his testing and before the pressure washer was shipped out.

### 2.    TI North America

Andrew Hornick, senior product safety engineer for TI North America, gave final review and approval to the Power Stroke operator manual and on-product labeling. Hornick led the pre-sale product safety review committee for the product. On December 5, 2008, the product safety review committee met in a conference room at TI North America. The committee addressed topics such as safety, specifications for component parts to be supplied by others and on-product labels to be affixed to the Power Stroke. TI North America ultimately approved the product for sale. Also,

TI North America procured or was involved in procuring the engines used in the product from America Honda Motor Co.

### 3.     TI Factory Outlets

TI Factory Outlets did not design, manufacture, repair or recondition the Power Stroke.  Defendants contend that TI Factory Outlets sold the product in substantially the same condition as it received it for resale and with all on-product labels, owners and operators' manuals supplied by the manufacturer.

### F.     Value Of Harris Home

Mark Gray, senior field property adjuster for American Family, adjusted the Harris homeowner's insurance claim following the fire at their home.  Gray determined that the house was a total loss because the cost to rebuild the home would exceed the policy limits.[12]  In determining what to pay under the homeowner's policy, American Family did not consider the fair market value of the home or personal property.

Harris testified that before the fire, he figured the fair market value of his home was "close to $300,000."  The Harrisses' tax return for 2010 declared $275,000 as the fair market value of the house.  In his deposition, Harris stated that this amount "sounds good."  His wife, Mandy Harris, testified that the 2010 tax return declared that (1) before the fire, the fair market value of the home was $275,000; (2) after the fire, the fair market value was $45,000; and (3) before the fire, the fair market value of the contents in the home was $22,000.

## III.    Analysis

Against all defendants, plaintiffs assert claims under the Kansas Product Liability Act,

---

[12]      The record does not discloses the policy limits.

-12-

K.S.A. § 60–3301 et seq., that at the time the Power Stroke was manufactured, distributed and sold, it was unreasonably dangerous due to (1) inadequate warnings; (2) design defects; and (3) manufacturing defects.[13]  See Pretrial Order (Doc. #57) filed September 24, 2013 at 15-16. Defendants seek summary judgment on grounds that (1) plaintiffs cannot establish a prima facie case of product liability based on a manufacturing or design defect; (2) plaintiffs cannot prevail on their warning claim; (3) TI Factory Outlets is an innocent seller under K.S.A. § 60-3306; (4) TI North America did not design, manufacture or distribute the Power Stroke; and (5) plaintiffs' claims for damages for real and personal property are limited to loss in fair market value.

### A.    Manufacturing And/Or Design Defects

Plaintiffs contend that the Power Stroke was defectively manufactured and/or designed because (1) during and after use, the muffler guard became and remained hotter than an ordinary consumer would expect; (2) the product was missing a clamp on the fuel line; and (3) the Power Stroke violated safety standards of the American National Standards Institute ("ANSI").[14]  See Plaintiffs' Memorandum (Doc. #77) at 34-38.

Defendants assert that plaintiffs cannot establish a prima facie case of product liability on these claims.  To establish a prima facie case, plaintiffs must show the following elements: (1) the

---

[13]    Plaintiffs attempt to assert a separate claim that defendants negligently manufactured, distributed and sold the Power Stroke without protecting against the dangerous nature of the product. See Pretrial Order (Doc. #57) filed September 24, 2013 at 16.  This claim is subsumed within the KPLA claims.  See Samarah v. Danek Med. Inc., 70 F. Supp.2d 1196, 1202 (D. Kan. 1999) (purpose of KPLA is to consolidate all product liability actions into one theory of legal liability); Patton v. Hutchinson Wil-Rich Mfg. Co., 253 Kan. 741, 756, 861 P.2d 1299, 1311 (1993); Savina v. Sterling Drug, Inc., 247 Kan. 105, 127, 795 P.2d 915, 931 (1990) (KPLA provisions apply to actions based on strict liability as well as negligence, breach of express or implied warranty, and breach of or failure to discharge duty to warn or instruct).  Accordingly, the Court does not consider it separately.

[14]    Plaintiffs do not specify whether their allegations constitute design or manufacturing defects.

-13-

injury resulted from a condition of the product; (2) the condition was unreasonably dangerous; and (3) the condition existed at the time it left defendants' control.  See Jenkins v. Amchem Prods., Inc., 256 Kan. 602, 630, 886 P.2d 869, 886 (1994); Mays v. Ciba-Geigy Corp., 233 Kan. 38, 54, 661 P.2d 348, 360 (Kan. 1983).  Plaintiffs may prove these elements by direct or circumstantial evidence. Ciba-Geigy, 233 Kan. at 54, 661 P.2d at 360.  For circumstantial evidence to make out a prima facie case, it must tend to negate other reasonable causes or an expert must opine that the product was defective.  Id.  Plaintiffs may not base liability on mere speculation, guess or conjecture; rather, the circumstances must justify an inference of probability as distinguished from mere possibility.  Id.

> **1.     Whether The Power Stroke Was Unreasonably Dangerous Because During And After Use The Muffler Guard Became And Remained Hotter Than An Ordinary Consumer Would Expect**

Plaintiffs assert that the Power Stroke was unreasonably dangerous  because during and after use, the muffler guard became and remained hotter than an ordinary consumer would expect.[15]  Id. at 34-36.  The parties agree that heat caused the fire: the power washer was hot and it was placed too close to combustible materials.  Thus plaintiffs can satisfy the first element of a prima facie case, i.e. that the injury resulted from a condition of the product.  The question therefore becomes whether plaintiffs can satisfy the second element, i.e. that the condition was unreasonably dangerous.  A product is unreasonably dangerous if, when used in the way it is ordinarily used considering the product's characteristics and common usage, it is dangerous to an extent beyond that which an ordinary consumer would contemplate with the ordinary knowledge common to the

---

[15]     Plaintiffs assert that they cannot determine whether the dangerous condition is common to all Power Stroke washers or only the washer which Harris used.  See Plaintiffs' Memorandum (Doc. #77)  at 35.  Because plaintiffs do not assert facts which show that the product performed other than as expected, the Court analyzes the claim as one based on a design defect.  See Jenkins, 256 Kan. at 635, 886 P.2d at 889 (allegation that product performed other than expected lends itself more to manufacturing defect than design defect).

community as to its characteristics. <u>Delaney v. Deere & Co.</u>, 268 Kan. 769, 793, 999 P.2d 930, 946 (2000); <u>Jenkins</u>, 256 Kan. at 635, 886 P.2d at 889.

Although their argument is somewhat difficult to follow, plaintiffs apparently contend that the fact that a Power Stroke can get hot enough to start a fire is inherently and unreasonably dangerous.[16] <u>See</u> <u>Plaintiffs' Memorandum</u> (Doc. #77) at 35. The mere fact of injury, however, does not imply a design defect. <u>Jenkins</u>, 256 Kan. at 635, 886 P.2d at 889. In <u>Jenkins</u>, the Kansas Supreme Court stated as follows:

> Inferring a defect from the fact of the injury, particularly where, as here, the product was exactly what the defendants intended and plaintiff makes no argument that the product could have been designed to more safely perform its intended function, is unsuitable.

<u>Id.</u>

Similarly, in this case, that fact that the pressure washer became hot enough to start a fire does not itself show a design defect. Plaintiffs bear the burden to show that the product was defective. <u>Id.</u>, 256 Kan. at 633, 886 P.2d at 890. Plaintiffs point to no aspect of the Power Washer

---

[16] In support of this claim, plaintiffs assert new facts which they did not include in their statement of facts. <u>See</u> <u>Plaintiffs' Memorandum</u> (Doc. #77) at 34-35. For example, plaintiffs assert as follows:

> Marcus Greene, former Quality Manager for OWT Industries, testified that fifteen minutes should have been sufficient for the pressure washer to cool after use, and, that if the pressure washer caused a fire, it "got hotter than it was supposed to." Greene Dep. at 85:21-86:1; 90:21-91:7.

<u>Id.</u> at 35.

As noted, pursuant to D. Kan. Rule 56.1, the Court does not consider facts which the parties discuss only in the argument section of their briefs and not in the statement of facts. <u>See</u> <u>Cook</u>, 2011 WL 2690060, at *2 n.1; <u>Jones</u>, 552 F. Supp.2d at 1261 n.1. Moreover, even if the Court considered these facts, they do not support an inference of probability as to what a ordinary consumer would contemplate.

that was defectively designed. On this record, plaintiffs have not shown a genuine fact issue as to the second element of a prima facie case, i.e. whether the muffler guard was unreasonably dangerous.[17] Accordingly, defendants are entitled to summary judgment on plaintiffs' claim that the Power Stroke was defective because the muffler guard became hot during use and afterwards remained hot enough to start a fire.

### 2. Whether The Power Stroke Was Unreasonably Dangerous Because It Was Missing A Clamp On The Fuel Line

Plaintiffs assert that the Power Stroke was unreasonably dangerous because it was missing a clamp on the fuel line. Construed in a light most favorable to plaintiffs, the facts suggest that on the day of the fire, the product was missing a fuel-line clamp. Plaintiffs' Memorandum (Doc. #77) at 36. Even if plaintiffs could show the third element of a prima facie case, i.e. that the condition existed at the time the product left defendants' control, they have not presented evidence to satisfy the first two elements, i.e. that the condition caused the fire and that the condition was unreasonably dangerous. Plaintiffs assert that a reasonable jury could determine that the missing clamp was a cause of the fire. Id. at 37. Plaintiffs present no evidence, however, that a missing fuel-line clamp would cause a fire.[18] Id. Likewise, plaintiffs present no evidence that a missing fuel-line

_____

[17] Even if plaintiffs could prove the second element of a prima facie case, it appears that they cannot show the third element, i.e. that the unreasonably dangerous condition existed at the time it left defendants' control. Obviously, the Power Stroke was not hot at the time it left defendants' control. To the extent plaintiffs are complaining about some design or manufacturing defect which caused superheating, they do not state what it is.

[18] In support of the assertion, plaintiffs assert facts which they did not include in their statement of facts and which the Court does not consider. In the argument section of their brief, plaintiffs state as follows:

Defendants' expert, Jack Hyde, acknowledges that gasoline has been reported to ignite at temperatures as low as 495°F. Hyde Rep. at 23. This is within the range

(continued...)

-16-

clamp would constitute an unreasonably dangerous condition.  On this record, plaintiffs have not shown a genuine fact issue as to the first and second elements of a prima facie case.  Defendants are therefore entitled to summary judgment on plaintiffs' claim that the Power Stroke was defective because it was missing a clamp on the fuel line.

> **3.      Whether The Power Stroke Was Unreasonably Dangerous Because It Violated Safety Standards Of The ANSI**

Plaintiffs assert that the Power Stroke was unreasonably dangerous because it did not comply with safety standards of the ANSI.  Specifically, plaintiffs assert that the product violated UL 1776 Standards which provide, in essence, that a pressure washer shall not reach a temperature high enough to cause a fire.  Id. at 37-38.  As noted, the parties agree that heat from the Power Stroke caused the fire.  Accordingly, it appears that plaintiffs can satisfy the first element of a prima facie case, i.e. that the injury resulted from a condition of the product.  The question therefore becomes whether plaintiffs can satisfy the second element of a prima facie case, i.e. that the condition was unreasonably dangerous.

As noted, a product is unreasonably dangerous if, when used in the way it is ordinarily used considering the product's characteristics and common usage, it is dangerous to an extent beyond that

---

[18](...continued)
 of temperatures Mr. Hyde concedes are necessary to ignite solid combustibles.  Id. at 24.

Plaintiffs' Memorandum (Doc. #77) at 37.

As noted, pursuant to D. Kan. Rule 56.1,  the Court does not consider facts which the parties discuss only in the argument section of their briefs and not in the statement of facts.  See Cook, 2011 WL 2690060, at *2 n.1; Jones, 552 F. Supp.2d at 1261 n.1.  Moreover, even if the Court considered the additional facts, they do not create an inference of probability that the missing clamp caused the fire.  See Plaintiffs' Memorandum (Doc. #77) at 37 (asserting that it is "equally plausible" that first material ignited in garage was gasoline from loose and leaking gas line).

which an ordinary consumer would contemplate with the ordinary knowledge common to the community as to its characteristics. Delaney, 268 Kan. at 793, 999 P.2d at 946; Jenkins, 256 Kan. at 635, 886 P.2d at 889. The uncontroverted facts establish that UL 1776 is not a binding or mandatory standard or regulation and that no manufacturer of pressure washers currently lists its pressure washer with UL 1776. Plaintiffs present no evidence which suggests that an ordinary consumer would expect a pressure washer to comply with UL 1776 Standards. Thus, plaintiffs have not shown that UL 1776 imposes the standard for reasonableness in this case. See, e.g., Pfeiffer v. Eagle Mfg. Co., 771 F. Supp. 1133, 1136 (D. Kan. 1991) (standards issued by private entities merely voluntary and do not constitute mandatory consumer product safety standard). On this record, plaintiffs have not shown a genuine fact issue as to the second element of a prima facie case, i.e. that the failure to comply with ANSI safety standards constituted an unreasonably dangerous condition. Defendants are therefore entitled to summary judgment on this claim that the Power Stroke was defective because it violated safety standards of the ANSI.

**B.      Failure To Warn**

Plaintiffs claim that at the time defendants manufactured, distributed and sold the Power Stroke, it was unreasonably dangerous due to inadequate warnings. Defendants assert that they are not liable under this theory because (1) they did not owe a duty to warn Harris about dangers which he already knew; and (2) plaintiffs cannot show causation. Defendants' Memorandum (Doc. #63) at 21-23.

**1.      Duty To Warn**

Defendants assert that they did not owe a duty to warn Harris about dangers which he already knew. Id. at 21-22. Under Kansas law, manufacturers have a specific duty to warn

against a product's reasonably foreseeable dangers. See, e.g., Burton v. R.J. Reynolds Tobacco Co., 397 F.3d 906, 917 (10th Cir. 2005). Under the KPLA, however, the duty does not extend to "warnings, protecting against or instructing with regard to those safeguards, precautions and actions which a reasonable user or consumer of the product, with the training, experience, education and any special knowledge the user or consumer did, should or was required to possess . . . under all the facts and circumstances." K.S.A. § 60-3305. Under this provision, defendants did not owe a duty to warn Harris of dangers which he actually knew. See Miller v. Lee Apparel Co., Inc., 19 Kan. App.2d 1015, 1030, 881 P.2d 576, 588 (1994) (citing Long v. Deere & Co., 238 Kan. 776, 773, 715 P.2d 1023, 1029 (1986)).

Defendants assert that Harris was a trained mechanic who had experience with gasoline-powered vehicles and tools, including pressure washers, and that he knew that engines get hot with use and can ignite combustible materials. Defendants' Memorandum (Doc. #63) at 22. The record establishes that Harris knew the following: (1) gasoline engines burn gasoline; (2) engines and their components become hot during operation; (3) he himself had suffered burns from touching a hot engine; (4) exhaust gases from engines are hot; (5) metal parts that vent hot exhaust gases get hot; (6) engines stay hot for a period of time after the engine stops; (7) exhaust parts of engines stay hot for a period of time after the engine stops; (8) plastic can burn; (9) paper can burn; (10) fabric can burn; (11) dried remnants of grass clippings and leaves can burn; and (12) gasoline burns. While these facts show that Harris had extensive knowledge and experience regarding gasoline-powered engines, they do not establish as a matter of law that he knew or should have known of the specific danger in this case, i.e. that the Power Stroke could remain hot enough after use to ignite nearby combustible materials. See, e.g., Meyerhoff v. Michelin Tire Corp., 852 F. Supp. 933, 944 (D. Kan.

1994) (evidence did not establish as matter of law that plaintiff was such experienced user that he should fully appreciate risk). Thus, defendants are not entitled to summary judgment on this ground.

### 2. Causation

Defendants assert that plaintiffs cannot show causation, i.e. that the alleged failure to warn proximately caused plaintiffs' injuries. Specifically, defendants contend that the operator manual warns about the dangers of which plaintiffs complain but that Harris chose not to read and heed the warnings. Defendants' Memorandum (Doc. #63) at 23. Kansas law presumes that an adequate warning will be read and heeded. See Meyerhoff, 852 F. Supp. at 946. Where adequate warnings are in fact given, this presumption operates to the benefit of manufacturers. See Wooderson v. Ortho Pharm. Corp., 235 Kan. 387, 411 681 P.2d 1038, 1057 (1984) (quoting Ortho Pharm. Corp. v. Chapman, 388 N.E.2d 541, 555 (Ind. 1979)). If warnings are inadequate, however, the law imposes a rebuttable presumption of causation. See id. In other words, if plaintiffs establish the fact of an inadequate warning, the burden of proof shifts to defendants to show that the inadequate warning did not cause plaintiffs' injuries. See Burton, 397 F.3d at 913. Under Kansas law, whether a warning is adequate depends upon whether it is reasonable under the circumstances. See Ralston v. Smith & Nephew Richards, Inc., 275 F.3d 965, 975 (10th Cir. 2001). For a warning to be adequate, it must be of such a nature to be comprehensible to the average user and convey to the mind of a user a fair indication of the nature and extent of the danger. Wheeler v. John Deere Co., 862 F. 2d 1404, 1413 (10th Cir. 1988). The determination whether a warning is adequate is a question of fact. See Graham v. Wyeth Labs., Div. of Am. Home Prod. Corp., 666 F. Supp. 1483, 1499 (D. Kan. 1987).

Defendants assert that the operator manual warned of the very danger of which plaintiffs

complain, i.e. that "the pressure washer becomes hot with use and should not be placed in contact

or close proximity with combustible materials until it has cooled down." Defendants' Memorandum

(Doc. #63) at 23.[19]  In support of the assertion, defendants do not cite specific provisions of the

operator manual.  See id.  It appears that defendants are drawing from warnings which are spread

throughout the manual.  See Power Stroke Operator Manual at 4, 13.

Page 4 of the manual lists 37 bullet points of "Specific Safety Rules" which include, inter

alia, the following:

- **Keep cooling air intake** (recoil starter area) and muffler side of engine at least 3 feet away from buildings, obstructions, or other combustible objects.
- **Keep the engine away from flammables and other hazardous materials.**
- **Keep away from hot parts.**  The muffler and other engine parts become very hot; use caution.
  \* \* \*
- **Make sure minimum clearance of 3 feet** is maintained from combustible materials.

Power Stroke Operator Manual at 4 (emphasis in original).  These provisions convey that the

machine gets hot and should be kept away from flammable and combustible materials, but they do

not communicate that the danger exists after the machine has been turned off.  Another bullet point

_____

[19]      Defendants also assert that "[i]t is uncontroverted the pressure washer's warning system – the on-product warnings and the operator's manual – complied with all mandatory and voluntary statutes[,] regulations and industry guidelines." Id. at 22.  Defendants cite no authority to support that such compliance defeats liability as a matter of law.  See, e.g., Graham, 666 F. Supp. at 1499 (fact that vaccine warnings complied with FDA standards does not show warning was adequate as matter of law).

Under K.S.A. § 60-3304, "when the injury-causing aspect of the product was, at the time of manufacture, in compliance with legislative regulatory standards or administrative regulatory safety standards . . . [which] addressed warnings or instructions, the product shall be deemed not defective by reason of warnings or instructions, unless the claimant proves by a preponderance of the evidence that a reasonably prudent product seller could and would have taken additional precautions." Defendants point to no applicable regulatory standards which addressed product warnings or instructions.

on the same page states that "**[b]efore storing, allow engine to cool**," but it does not state how long

it should cool or the dangers of not cooling. Id. (emphasis in original). Nine pages later, on page

13, in the "Maintenance" section under the heading "Storing The Pressure Washer," the manual

states as follows:

> Store the pressure washer with the gas tank empty by either draining the tank or
> running the pressure washer until the gas runs out. Allow 30 minutes of "cool down"
> time before storing the machine. Store in a dry, covered area where the weather
> can't damage it.

Id. at 13. The text is not in bold and does not explain why the gas tank should be emptied or why

the unit should cool down for 30 minutes.[20] Id.

Plaintiffs assert that the operator manual does not clearly communicate the danger of fire in

storing a hot machine. Plaintiffs assert that the manual requires the user to draw inferences and

connections among several statements in different sections to understand that certain hazards may

apply not only during operation of the machine, but also during its shutdown and storage.[21]

Construed in the light most favorable to plaintiffs, the record supports plaintiffs' assertions. In

various places, the manual states that the machine gets hot and should be kept away from flammable

and combustible materials, but it does not clearly communicate that the threat of fire exists after the

machine is turned off. On this record, a material fact issue exists as to the whether the warnings

---

[20]     A few paragraphs later, the manual states as follows: "Drain the fuel tank completely.
Stored gas can go stale in 30 days." Power Stroke Operator Manual at 13. This language implies
that the reason the user should store the pressure washer with an empty tank is to protect against
stale gas, not the risk of fire.

[21]     In support of their assertions, plaintiffs cite testimony by their expert, Michael
Wogalter, which they do not include in their statement of facts. See Plaintiffs' Memorandum
(Doc. #77) at 39-40. As discussed, the Court does not consider facts which the parties did not
include in the statement of facts. Nevertheless, even without the expert testimony, the summary
judgment record supports plaintiffs' assertions in this regard.

given were adequate. Construing the evidence in the light most favorable to plaintiffs, a fact finder could reasonably conclude that the operator manual does not clearly convey to the average user a fair indication of the nature and extent of the danger, i.e. that storing a hot pressure washer after use can ignite nearby combustible materials. Accordingly, defendants are not entitled to summary judgment on the failure to warn claim.

### C.    Whether TI Factory Outlets Is An Innocent Seller Under K.S.A. § 60-3306

Defendants assert that under K.S.A. § 60-3306(a), TI Factory Outlets is immune from liability because it is an innocent seller. Section 60-3306(a) provides as follows:

> a) A product seller shall not be subject to liability in a product liability claim arising from an alleged defect in a product, if the product seller establishes that:
>
> (1) Such seller had no knowledge of the defect;
> (2) such seller in the performance of any duties the seller performed, or was required to perform, could not have discovered the defect while exercising reasonable care;
> (3) such seller was not a manufacturer of the defective product or product component;
> (4) the manufacturer of the defective product or product component is subject to service of process either under the laws of the state of Kansas or the domicile of the person making the product liability claim; and
> (5) any judgment against the manufacturer obtained by the person making the product liability claim would be reasonably certain of being satisfied.

K.S.A. § 60-3306(a). As the product seller, TI Factory Outlets bears the burden to prove each element of the innocent seller defense.[22] See Koehn v. Yamaha Motor Corp., No. 94-1112-JTM, 1996 WL 695409, at *3 (D. Kan. Nov. 5, 1996).

As to the first element, i.e. that seller had no knowledge of the defect, in the argument section

---

[22]    As discussed, defendants are entitled to summary judgment on the product liability claims based on manufacturing and/or design defects. Accordingly, the Court considers the innocent seller defense only with respect to the failure to warn claim. See, e.g., Baughn v. Eli Lilly & Co., 356 F. Supp.2d 1177, 1183 (D. Kan. 2005) (under KPLA product can be defective in three ways: manufacturing defect; warning defect; and design defect).

of their brief, defendants assert conclusively that TI Factory Outlets had no knowledge of any defect in the Power Stroke.  See Defendants' Memorandum (Doc. #63) at 25.  In their statement of facts, however, defendants provide no facts regarding their knowledge of any defect.[23]  See id. at 4-16.  On this record, defendants have not satisfied their burden of proof with respect to the first element of the innocent seller defense.

As to the second element, i.e. that the seller could not have discovered the defect while exercising reasonable care, defendants assert that TI Factory Outlets did not have a duty to inspect or test for latent or hidden defects.  See id. at 25-27.  It is unclear what relevance, if any, this argument has to plaintiffs' failure to warn claim.  On this record, defendants have not satisfied their burden of proof with respect to the second element of the innocent seller defense.

As to the third element, i.e. that the seller was not a manufacturer of the defective product, defendants submit a declaration by a Factory Outlet employee which states that the Outlet Store did not design or manufacture the Power Stroke.  See Declaration of Darrell Ficke ¶ 13.  Plaintiffs do not specifically controvert this fact.  See Plaintiffs' Memorandum (Doc. #77) at 2.  Plaintiffs assert that TI Factory Outlets held itself out as the manufacturer of the Power Stroke, see id. at 31-32, but they do not cite record facts to support the assertion.[24]  On this record, defendants have established

---

[23]     The Court notes that the Declaration Of Darrell Ficke states that the Outlet Store has no knowledge of any defect in the Power Stroke.  Id. ¶ 11, Exhibit B to Defendants' Memorandum (Doc. #63).  Defendants did not include this fact in their statement of facts and plaintiffs have not had an opportunity to controvert it.  The Court therefore does not consider it.

[24]     In the argument section of their brief, plaintiffs assert that the following creates a genuine issue of material fact as to whether TI Factory Outlets held itself out as manufacturer of the Power Stroke:

> Techtronic Outlets operates retail stores under the name "Direct Tools Factory Outlets."  This necessarily implies that the manufacturer [] is offering its own

(continued...)

the third element, i.e. that TI Factory Outlets did not manufacture the Power Stroke.

On this record, defendants have not shown that as a matter of law, TI Factory Outlets can satisfy all the elements of the innocent seller defense.[25] Accordingly, defendants are not entitled to summary judgment on this ground.

### D. Whether TI North America Designed, Manufactured Or Distributed The Power Stroke

Defendants assert that TI North America is not liable because it is not a designer, manufacturer, distributor or seller of the product. Specifically, in one paragraph, defendants assert that plaintiffs have no evidence that TI North America participated in any activities which would render it liable to plaintiffs under products liability or any other theory.[26] See id. at 27. In support of their assertion, defendants cite K.S.A. § 60-3302(c) for the general proposition that liability for a defective product is predicated on a party designing, manufacturing, distributing or selling the product.[27]

---

[24](...continued)
products "direct" to the consumers. There are no markings on the product's packaging that would have indicated, to a reasonable consumer, that the product was not in fact "manufactured" by Techtronic Outlets. See Packaging, attached as Exhibit 19, P. 1-2. Further, as a floor model, the pressure washer at issue would have been displayed without its associated packaging. No prominent markings on the product itself would indicate that its manufacturer was "OWT Industries, Inc." See Product Images, attached as Exhibit 20.

Plaintiffs' Response (Doc. #77) at 32. Plaintiffs did not include these facts in their statement of facts and the Court therefore does not consider them.

[25] In light of defendants' failure to demonstrate the first two elements, the Court does not reach the fourth and fifth elements of the innocent seller defense.

[26] Defendants assert that OWT Industries designed and manufactured the product.

[27] Section 3302(c) states as follows:

(continued...)

-25-

Plaintiffs cite evidence that TI North America was actively involved in the design and manufacture of the Power Stroke. Specifically, plaintiffs point to facts which suggest that TI North America's senior product safety engineer, Andrew Hornick, was responsible for drafting and reviewing the product manual and chaired the pre-sale product safety review of the product. Construed in a light most favorable to plaintiffs, the record suggests that TI North America was involved in approving the Power Stroke for sale. Specifically, the record suggests that Hornick led the pre-sale product safety review committee – which met in a conference room at TI North America – and that Hornick gave the final review and approval to the operator manual and on-product labeling.[28] On this record, defendants have not shown that as a matter of law, TI North America cannot be held liable as a designer, manufacturer, distributor or seller of the product. See, e.g., Deines v. Vermeer Mfg. Co., 752 F. Supp. 989, 993-97 (D. Kan. 1990) (insurer's active advice regarding product design and warnings subjected it to liability for product liability claims). Defendants are not entitled to summary judgment on this ground.

---

[27](...continued)
"Product liability claim" includes any claim or action brought for harm caused by the manufacture, production, making, construction, fabrication, design, formula, preparation, assembly, installation, testing, warnings, instructions, marketing, packaging, storage or labeling of the relevant product. It includes, but is not limited to, any action based on, strict liability in tort, negligence, breach of express or implied warranty, breach of, or failure to, discharge a duty to warn or instruct, whether negligent or innocent, misrepresentation, concealment or nondisclosure, whether negligent or innocent, or under any other substantive legal theory.

K.S.A. § 60-3302(c).

[28]     Defendants assert that Hornick is employed by OWT, not TI North America. See Defendants' Reply at 4 ¶ 1. OWT's interrogatory answers, however, state that Hornick is the senior engineer of product safety for TI North America. See Defendant OWT Industries, Inc.'s Objections And Response To Plaintiff American Family Mutual Insurance Company's First Set Of Interrogatories To Defendant at 6, Exhibit 1 to Plaintiffs' Memorandum (Doc. #77). In ruling on defendants' motion for summary judgment, the Court construes this fact in favor of plaintiffs.

**E.** **Whether Plaintiffs' Damages For Real And Personal Property Loss Are Limited To The Difference In Fair Market Value**

American Family seeks damages in the amount of $653,342.24, i.e. the total amount which it paid to Robert and Mandy Harris under the insurance policy.[29] Pretrial Order (Doc. #57) at 26-27. In addition, Robert and Mandy Harris seek damages in the amount of $320,000 for uninsured losses.[30] Id. at 3, 5, 27.

Defendants assert that plaintiffs' damages for loss of real and personal property are limited to the difference in fair market value of the property before and after the fire. See Defendants' Memorandum (Doc. #63) at 27-30. In support of the assertion, defendants cite general rules regarding permanent damage to real and personal property, i.e. that the proper measure of damages is the difference between the fair and reasonable market value of the property immediately before and after the injury. Id. at 28-29.

In Evenson v. Lilley, 295 Kan. 43, 282 P.3d 610 (2012), the Kansas Supreme Court explained general rules regarding property damages as follows:

> when a house is burned to the ground, the tortfeasor is liable for the amount by which the value of the property has diminished. When, however, the property is damaged in such a way that it can be restored, as when a house suffers smoke and water damage in a fire, the tortfeasor is liable for the costs of restoring the property to its former condition, up to the total value of the property.

Id., 295 Kan. at 47, 282 P.3d at 614.

While defendants correctly state general principles regarding property damages, see Defendants' Memorandum (Doc. #63) at 23-30, they cite no authority which demonstrates that as

---

[29] The $653,342.24 is comprised of $390,234.00 for the building, $225,161.00 for contents of the building and $37,947.24 for alternate living expenses. Pretrial Order (Doc. #57) at 26-27.

[30] The record does not contain a breakdown of uninsured losses.

a matter of law plaintiffs' damages in this case are limited to the loss in fair market value of their real and personal property. Indeed, Kansas courts have stated that no set rule exists regarding the recovery of damages for the loss of real property. <u>See</u>, <u>e.g.</u>, <u>Horsch v. Terminix Int'l Co.</u>, 19 Kan. App.2d 134, 139, 865 P.2d 1044, 1049 (1993). Rather, the measure of damages depends on the facts of the case, <u>i.e.</u> a tortfeasor is liable for injuries and subsequent losses that are the natural and probable result of its act. <u>See</u> <u>Ettus v. Orkin Exterm. Co.</u>, 233 Kan. 555, 562, 665 P.2d 730, 737 (1983); <u>Horsch</u>, 19 Kan. App.2d at 139, 865 P.2d at 1049. Where other damages are present, damages resulting from negligence are not limited to the difference in fair market value of the property. <u>See</u> <u>Ettus</u>, 233 Kan. at 562, 665 P.2d at 737; <u>Horsch</u>, 19 Kan. App.2d at 139, 865 P.2d at 1049.

Here, in addition to property damage, plaintiffs seek damages for costs including debris removal, emergency repair and alternate living expenses. <u>See</u> <u>Pretrial Order</u> (Doc. #57) at 26-27. On this record, defendants have not shown that as a matter of law, plaintiffs' damages are limited to the difference in fair market value of their real and personal property before and after the fire.[31]

**IT IS THEREFORE ORDERED** that defendants' <u>Motion For Summary Judgment</u> (Doc. #62) filed October 25, 2013 be and hereby is **SUSTAINED in part**. The Court grants summary judgment in favor of defendants on plaintiffs' claims that defendants manufactured,

---

[31] Although defendants do not articulate it as such, they appear to be making an estoppel argument, <u>i.e.</u> that Robert and Mandy Harris cannot claim that the difference in fair market value of their real and personal property is different from amounts which they declared on their 2010 tax return. <u>See</u> <u>Defendants' Memorandum</u> (Doc. #63) at 30. As noted, in their 2010 tax return the Harrises declared that before the fire, the fair market value of the home was $275,000 and that after the fire it was $45,000. The Harrises also declared that before the fire, the fair market value of contents in the home was $22,000. Defendants cite no authority to support their claim that as a matter of law, the tax return declarations limit the amount of damages which plaintiffs may recover in this case.

distributed and/or sold a product which was unreasonably dangerous due to defects in its design and/or defects in its manufacture. Defendants' motion is otherwise overruled. Plaintiffs' remaining claim is that defendants manufactured, distributed and/or sold a product which was unreasonably dangerous due to inadequate warnings.

**IT IS FURTHER ORDERED** that Plaintiffs' Motion For Summary Judgment On Defendants' Fourth Affirmative Defense And Memorandum In Support Thereof (Doc. #60) filed October 25, 2013 be and hereby is **OVERRULED as moot**.

**IT IS FURTHER ORDERED** that Defendants' Motion To Strike Or Disregard The Declaration Of Plaintiff Robert Harris And Supporting Memorandum (Doc. #86) filed December 13, 2013 be and hereby is **OVERRULED**.

**IT IS FURTHER ORDERED** that Defendants' Motion To Strike Or Disregard The Declaration Of Jennifer Chick, CPA, And Supporting Memorandum (Doc. #83) filed December 13, 2013 be and hereby is **OVERRULED as moot**.

Dated this 16th day of May, 2014 at Kansas City, Kansas.

s/ Kathryn H. Vratil
Kathryn H. Vratil
United States District Judge